T.C. Memo. 1999-255


UNITED STATES TAX COURT


BARRY S. AND YVONNE C. HILLMAN, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 16506-97.          Filed August 2, 1999.


<u>Arnold O. Zacks</u>, for petitioners.

<u>John J. Boyle</u>, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION

GALE, <u>Judge</u>: Respondent determined the following deficiencies and accuracy-related penalties with respect to petitioners' Federal income tax:

| Year | Deficiency | Penalty<br>sec. 6662 |
|------|-----------|----------------------|
| 1993 | $8,471 | $1,694 |
| 1994 | 7,366 | 1,473 |

Unless otherwise noted, all section references are to the Internal Revenue Code in effect for the years in issue. All Rule references are to the Tax Court Rules of Practice and Procedure. All dollar amounts are rounded to the nearest dollar.

The issues for decision are: (1) Whether petitioners' activity relating to the breeding and showing of horses was an activity engaged in for profit. We hold that it was not. (2) Whether petitioners are entitled to business mileage deductions over and above the amounts respondent has allowed. We hold that they are not. (3) Whether petitioners are liable for accuracy-related penalties under section 6662(a). We hold that they are.

                        FINDINGS OF FACT

Some of the facts have been stipulated and are so found. We incorporate by this reference the stipulation of facts and attached exhibits.

At the time of filing the petition, petitioners resided in Lewis Center, Ohio. Petitioners filed joint tax returns for the years in issue, which were prepared by Barry Adelman, C.P.A.

Horse-Related Activities

Petitioners were married in 1969 and have two children, Todd and Denise. Denise was born in 1974, and she has received training in showing horses since 1982, when she was 8 years old. During the years in issue, petitioners lived in a residence situated on 8.5 acres, on which was also located a garage, seven-

stall barn, riding arena for horses, pasture land, and an acre of trail and woods.

Petitioner Barry Hillman (Dr. Hillman) was 64 years old at the time of trial and a medical doctor. During the years at issue and continuing through the time of trial, Dr. Hillman operated a medical practice in Columbus, Ohio, as a sole practitioner with three employees. Petitioner Yvonne Hillman has assisted Dr. Hillman in his medical practice as an office worker since 1969. During the years in issue, Mrs. Hillman was Dr. Hillman's office manager and kept the books for his medical practice. She was paid $3,600 in annual wages during 1993 and 1994 for which she was issued Forms W-2. Petitioners provided Mr. Adelman with all original checks, deposit slips, and financial records for Dr. Hillman's medical practice. In 1993 and 1994, Dr. Hillman devoted between 45 and 50 hours per week to the practice.

On their 1991, 1992, 1993, 1994, 1995, and 1996 joint returns,[1] petitioners reported the following income and expenses from Dr. Hillman's medical practice on Schedule C:

---

[1] Petitioners have reserved a relevancy objection with respect to post-1994 exhibits. Sec. 1.183-2(a), Income Tax Regs., directs consideration of "all of the facts and circumstances" in determining whether an activity is engaged in for profit, and evidence from years subsequent to the years in issue is relevant to the extent it may create inferences regarding the existence of a profit motive in the earlier years. See, e.g., Hoyle v. Commissioner, T.C. Memo. 1994-592; Smith v. Commissioner, T.C. Memo. 1993-140. We therefore overrule petitioners' relevancy objection.

| Year | Gross income | Total expenses | Net profit or (loss) |
|------|--------------|----------------|----------------------|
| 1991 | $347,239 | $166,448 | $180,791 |
| 1992 | 338,812 | 179,465 | 159,347 |
| 1993 | 361,316 | 179,467 | 181,849 |
| 1994 | 337,346 | 194,984 | 142,362 |
| 1995 | 433,447 | 194,278 | 239,169 |
| 1996 | 329,884 | 163,415 | 166,469 |

In 1993 and 1994, Dr. Hillman also reported on Schedule C consulting fees in the amounts of $5,000 and $10,000, respectively.

On their joint returns for the 1991, 1992, 1993, 1994, 1995, and 1996 taxable years, petitioners reported an activity described as "show horses" on Schedule C. Since 1991, petitioners have reported the following income and expenses with respect to their show horse activity:

| Year | Gross income | Total expenses | Net profit or (loss) |
|------|--------------|----------------|----------------------|
| 1991 | $0 | $14,964 | ($14,964) |
| 1992 | 0 | 17,386 | (17,386) |
| 1993 | 0 | 19,383 | (19,383) |
| 1994 | 0 | 17,775 | (17,775) |
| 1995 | 150 | 17,222 | (17,072) |
| 1996 | 1,000 | 11,086 | (10,086) |
| Total | 1,150 | 97,816 | (96,666) |

The expenses that petitioners claimed with respect to their show horse activity consisted of the following items and amounts:

|  | 1991 | 1992 | 1993 | 1994 | 1995 | 1996 |
|---|---|---|---|---|---|---|
| Advertising | --- | --- | $85 | $45 | --- | $25 |
| Depreciation | $1,440 | $4,019 | 4,321 | 3,728 | $4,235 | 3,154 |
| Insurance | 216 | 511 | 557 | --- | 557 | 576 |
| Supplies | 75 | 425 | --- | --- | --- | --- |
| Repairs | --- | --- | --- | --- | 165 | --- |
| Veterinarian | 1,270 | 432 | 803 | 229 | 612 | 663 |
| Horse shows | 3,338 | 2,946 | 2,068 | 2,413 | 1,633 | --- |
| Dues | 116 | 480 | 415 | 175 | 210 | 455 |
| Feed & bedding | 3,139 | 2,281 | 4,225 | 3,050 | 3,932 | 4,556 |
| Professional training & board | 3,695 | 3,785 | 2,780 | 4,380 | 3,070 | --- |
| Stable help | 810 | 1,580 | 2,130 | 1,880 | 2,040 | 1,189 |
| Blacksmith | 865 | --- | --- | --- | 497 | 365 |
| Farrier | --- | 927 | 1,105 | 896 | --- | --- |
| Equipment & outfit | --- | --- | 894 | 979 | 66 | 43 |
| Sponsorship | --- | --- | --- | --- | 205 | 30 |
| Transfer fee | --- | --- | --- | --- | --- | 30 |

Dr. Hillman has been involved with horses for 40 years. He has owned horses since 1982, when he purchased two Morgan horses, Pal Joey and Lady Arrow. A Morgan is a very even-tempered breed that is quite versatile, suitable for riding, jumping, or draft purposes. Morgans live approximately 30 years.

In 1987 or 1988, Dr. Hillman was involved in a prior horse-breeding activity, which was abandoned after 3 years because it was unprofitable.

During the years 1991 through 1996, petitioners owned five horses, Riskybiznis, Ben Hur, Chicardo, Ashley, and Pal Joey, but only two of the horses were consistently claimed as part of petitioners' show horse activity during the period; namely, Riskybiznis, claimed for every year, and Ben Hur, claimed for every year starting in 1992 when petitioners acquired him. Chicardo, although purchased in 1985 and sold on June 1, 1995, was claimed only in 1994 and 1995. Ashley, acquired in 1984 and

donated to a veterinary school in 1994, was claimed only in 1994. Pal Joey was owned throughout the period but never claimed. Petitioners took depreciation deductions with respect to the horses claimed as part of their show horse activity.

For 1993 and 1994, the years in issue, petitioners made no allocation of their claimed Schedule C expenses for feed and bedding and stable help between the horses they claimed as part of their show horse activity and the other horses that they owned.

Petitioners purchased Riskybiznis, a stallion, in 1988 for $7,200. The horse was gelded (neutered) in 1991 or 1992, rendering him incapable of breeding. Petitioners claimed Riskybiznis as part of their show horse activity in 1991, 1992, 1993, 1994, 1995, and 1996. Riskybiznis participated in the following horse shows:

| Name or location | Years | Prize money earned | Expenses |
|---|---|---|---|
| Gold Cup | 1991/1992 | Unknown | $1,495 |
| River Ridge | 1991 | Unknown | 792 |
| Silver Cup | 1991/1992 | Unknown | 846 |
| Penn-Ohio | 1990/1991 | Unknown | 932 |
| Jubilee | 1990 | Unknown | 386 |
| Totals | | Unknown | 4,451 |

In 1996, petitioners "leased" Riskybiznis to a trainer, an arrangement under which the trainer bore the costs of the horse's upkeep in exchange for the right to enter him in horse show

competitions.  Petitioners did not receive any cash or property with respect to this arrangement.

Petitioners purchased Ben Hur, a stallion, in 1992 for $12,000.  Morgan stallions generally begin to breed at about 4 years of age and can breed until approximately 28 years of age. Ben Hur has not produced offspring since petitioners purchased him, although he did produce offspring prior to their ownership. Petitioners claimed Ben Hur as part of their show horse activity in 1992, 1993, 1994, 1995, and 1996.  Ben Hur participated in the following horse shows:

| Name or location | Years | Prize money earned | Expenses |
|---|---|---|---|
| Gold Cup | 1992/1994/1995 | Unknown | $862 |
| River Ridge | 1992/1994/1995 | Unknown | 792 |
| Twin Rivers | 1995 | $35 | 525 |
| Buckeye | 1992/1994/1995 | 75 | 615 |
| Ohio State Fair | 1994 | Unknown | 266 |
| KYOVA | 1994 | Unknown | Unknown |
| Blue Ribbon Classic | 1994/1995 | Unknown | 350 |
| Delaware Cty Fair | 1994 | Unknown | 182 |
| Penn-Ohio | 1992 | 15 | 408 |
| Totals | | 125 | 4,000 |

Petitioners purchased Chicardo, a 3-year-old stallion, in 1985 for $1,500.  Petitioners gelded Chicardo in 1991 or 1992 because they decided that he was not good enough to hold for breeding.  Petitioners claimed Chicardo as part of their show horse activity for 1994 and 1995.  Chicardo did not participate in horse shows after 1990.  Chicardo was ridden partly for pleasure because he was not as valuable as Ben Hur or Riskybiznis, and petitioners were planning to sell him as an

easy-to-ride horse.  Petitioners sold Chicardo on June 1, 1995, for $1,800.

Petitioners purchased Ashley, a 2-year-old filly, in 1984 for $2,500.  Petitioners claimed Ashley for their show horse activity in 1994 only.  Ashley participated in two horse shows in 1990, for which neither the prize money nor expenses are known. Morgan mares generally begin to be bred at about 4 years of age and can produce one foal a year.  Ashley miscarried three foals in 4 years.  Ashley never produced a live foal, and had a history of uterine infections.  On October 5, 1994, petitioners donated Ashley to Ohio State University, College of Veterinary Medicine. Ashley had a uterine infection at the time of the donation.  Dr. Hillman executed a euthanasia authorization in connection with the donation, which was required by Ohio State University for all such donations.  After digestive problems were discovered, Ashley was euthanized on December 23, 1994.

On their 1994 return, petitioners claimed a deduction for a noncash charitable contribution with respect to Ashley in the amount of $4,800.  Petitioners' return reported that Ohio State University determined Ashley's fair market value.  However, Ohio State University does not provide appraisals for gifts of property and did not do so in Ashley's case.

None of petitioners' horses participated in horse shows in 1993.  Aside from the $125 earned by Ben Hur, petitioners did not

know the amount of their horses' winnings at any of the shows. When petitioners' horses were shown in a professional event, the trainer who showed the horses would normally subtract the prize money earned from the training bill. The total "known" expenses for horse shows during the period 1991 through 1996 totaled $8,451. Expenses for horse shows claimed on petitioners' returns for this period totaled $12,398.

From 1991 through 1994, Denise spent 5 to 6 hours every other day grooming and exercising the horses that petitioners included in their show horse activity. She was not compensated for her services. Denise showed petitioners' horses as an amateur. Prize money was generally not awarded to amateurs in the shows in which Denise participated; when awarded, it ranged between $15 and $25.

Petitioners used college students as stable help. The stable help would muck out the stalls and feed and care for the horses. Petitioners paid some of the stable help, while others worked in exchange for riding privileges. Dr. Hillman did not know whether Forms 1099 or W-2 were issued to any of the stable help.

Petitioners used six different trainers between 1991 and 1996, who worked with both Denise and the horses. These trainers were hired to train the horses and to provide instruction to Denise regarding how to show horses in competition.

Petitioners maintained a separate bank account for all of their horse-related expenditures. Dr. Hillman kept all bills and invoices related to the show horse activity in an envelope and would transfer the information every 2 to 4 weeks to a ledger kept for this purpose. In 1993, Dr. Hillman spent no more than 3 hours per month on bookkeeping and management duties with respect to his show horse activity.

Petitioners' accountant, Mr. Adelman, did not have access to any records for petitioners' show horse activity. Dr. Hillman instead provided Mr. Adelman with a yearend compilation of income and expense figures for the activity for inclusion on their tax returns.

Petitioners did not prepare or maintain a written business plan regarding their show horse activity. Dr. Hillman discussed petitioners' show horse activity with their accountant, but these discussions focused on the tax aspects of the activity.

Mileage Deduction

Respondent reduced petitioners' allowable deductions for business mileage that Dr. Hillman claimed with respect to his medical practice from $6,823 to $3,636 for the 1993 taxable year and from $8,128 to $4,308 for the 1994 taxable year.

Dr. Hillman maintained office hours 4 to 5 days a week, performed surgery at five hospitals 4 to 5 days per week, and made hospital rounds 5 to 6 days per week. The distance from his

residence to his medical office was 12 miles one way. Dr.
Hillman estimated his business mileage by subtracting 24 miles on
4 days of each week (representing one round trip between his
residence and medical office for each day he maintained office
hours) from the total change in miles on his odometer for the
year. In this manner, Dr. Hillman estimated business mileage of
24,368 miles and 28,027 miles for 1993 and 1994, respectively,
which he provided to Mr. Adelman. In respondent's determination,
these mileage figures were reduced to 12,987 and 14,854,
respectively.

OPINION

## I. Horse-Related Activities

The first issue to be resolved is whether petitioners'
activities involving the breeding and showing of horses
constituted an activity not engaged in for profit.[2] As a general
rule, individuals are not allowed to deduct losses attributable
to an activity "not engaged in for profit", except to the extent

---

[2] The parties have treated all of petitioners' horse-related
activities as a single activity for purposes of sec. 183, see
sec. 1.183-1(d)(1), Income Tax Regs., which we refer to as the
show horse activity, consistent with petitioners' usage on their
returns.

of any gross income generated by the activity.  See sec. 183(a) and (b)(2).[3]

Respondent asserts that petitioners were not engaged in the show horse activity for profit, which would result in a disallowance of their claimed losses to the extent that they exceeded gross income generated by the activity.  Petitioners argue that they were engaged in show horse activity for profit and that accordingly their losses are fully deductible.[4]

Section 183(c) defines an activity not engaged in for profit as an "activity other than one with respect to which deductions are allowable for the taxable year under section 162 or under paragraph (1) or (2) of section 212."  Deductions are allowable under section 162 or section 212 with respect to activities for which the taxpayer has the requisite section 183 profit motive. See Holmes v. Commissioner, ___ F.3d ___, ___ (6th Cir., July 1, 1999), revg. and remanding T.C. Memo. 1997-401; Hayden v. Commissioner, 889 F.2d 1548, 1552 (6th Cir. 1989) ("The threshold inquiry in determining whether an activity is a trade or business or is carried on for the production of income is whether the activity is engaged in for the primary purpose and dominant hope

---

[3] Deductions that would be allowable without regard to whether or not such activity is engaged in for profit are not restricted by this rule.  See sec. 183(b)(1).

[4] Petitioners have not argued that any of the losses claimed are nevertheless deductible by virtue of sec. 183(b)(1).

and intent of realizing a profit."), affg. T.C. Memo. 1988-310.
"Profit" for purposes of section 183(a) means economic profit,
independent of tax savings. See Hayden v. Commissioner, supra at
1552. "An activity is engaged in for profit if the taxpayer
entertained an actual and honest, even though unreasonable or
unrealistic, profit objective in engaging in the activity."
Campbell v. Commissioner, 868 F.2d 833, 836 (6th Cir. 1989),
affg. in part, revg. in part and remanding T.C. Memo. 1986-569;
see also Keanini v. Commissioner, 94 T.C. 41, 46 (1990); Dreicer
v. Commissioner, 78 T.C. 642, 644-645 (1982), affd. without
opinion 702 F.2d 1205 (D.C. Cir. 1983); sec. 1.183-2(a), Income
Tax Regs.

It is therefore the taxpayer's intent to earn a profit that
determines the deductibility of an activity's losses under
section 183, see Dreicer v. Commissioner, supra at 645; Bessenyey
v. Commissioner, 45 T.C. 261, 274 (1965), affd. 379 F.2d 252 (2d
Cir. 1967), and such intent is a question of fact, see Hayden v.
Commissioner, supra at 1552. Intent is to be determined by
examining all the facts and circumstances, giving greater weight
to objective facts than to the taxpayer's statement of intent.
See Siegel v. Commissioner, 78 T.C. 659, 699 (1982); Engdahl v.
Commissioner, 72 T.C. 659, 666 (1979); sec. 1.183-2(a) and (b),
Income Tax Regs. The taxpayer bears the burden of proving the
requisite profit objective. See Rule 142(a); Hayden v.

Commissioner, supra at 1552; Dreicer v. Commissioner, supra at 646; Golanty v. Commissioner, 72 T.C. 411, 426 (1979), affd. without published opinion 647 F.2d 170 (9th Cir. 1981).

Section 1.183-2(b), Income Tax Regs., sets forth a nonexclusive list of factors to be considered in determining whether an activity is engaged in for profit. See Campbell v. Commissioner, supra at 836. These factors are: (1) The manner in which the taxpayer carried on the activity; (2) the expertise of the taxpayer or his advisers; (3) the time and effort expended by the taxpayer in carrying on the activity; (4) the expectation that assets used in the activity may appreciate in value; (5) the success of the taxpayer in carrying on other similar or dissimilar activities; (6) the taxpayer's history of income or loss with respect to the activity; (7) the amount of occasional profits, if any, which are earned; (8) the financial status of the taxpayer; and (9) whether elements of personal pleasure or recreation are involved. No single factor is controlling. Rather, the facts and circumstances of the case taken as whole are determinative. See Abramson v. Commissioner, 86 T.C. 360, 371 (1986); sec. 1.183-2(b), Income Tax Regs.

Petitioners' proof with respect to their profit motive consists in large part of Dr. Hillman's uncorroborated self-serving testimony. Because Dr. Hillman signed an income tax return, under penalties of perjury, which reported that a donated

horse had been valued by the recipient educational institution, when such was not the case,[5] his credibility is subject to some doubt, and we give his testimony less weight as a result.

Manner in Which Activity Conducted

The fact that a taxpayer carries on an activity in a businesslike manner and maintains complete and accurate books and records may indicate that the activity was engaged in for profit. See sec. 1.183-2(b)(1), Income Tax Regs. The record is replete with instances where petitioners did not conduct the show horse activity in a businesslike manner. Petitioners had no written business plan. Asked to describe his business plan at trial, Dr. Hillman testified that it was to concentrate on breeding so that he would eventually build up a small herd. Yet petitioners had two of their three stallions gelded, and, so far as the record indicates, the third stallion--Ben Hur, who had produced several offspring prior to acquisition by petitioners--was bred only with Ashley, petitioners' mare with a history of foaling failures. Ashley was petitioners' sole mare, and she suffered three miscarriages before petitioners donated her to a veterinary school in 1994. Nevertheless, there is no evidence that petitioners ever sought a replacement mare, either during

---

[5] A representative of the institution testified at trial, without contradiction or challenge, that the institution never provided appraisals of donated property and did not do so in the case of Dr. Hillman's donation.

Ashley's difficulties or after her disposition. In sum, petitioners claimed a business plan focused on breeding, but in the 6 years they have engaged in this activity, they have not obtained a single foal or breeding fee.

Other unbusinesslike conduct abounds. Petitioners did not allocate the costs of feed, bedding, and stable help between horses claimed as part of the show horse activity and those not claimed. Similarly, they treated all amounts paid to trainers as a business cost, although the testimony revealed that these trainers in part provided instruction to petitioners' daughter regarding how to show horses. Dr. Hillman could not recall whether, and there is no evidence that, they issued Forms W-2 or 1099 to the show horse activity's workers; by contrast, such formalities were observed in the conduct of Dr. Hillman's medical practice. Likewise, petitioners' accountant was provided the complete records of the medical practice; he received only year-end compilations with respect to the show horse activity.

The evidence demonstrates that the records maintained by petitioners with respect to the activity were neither accurate nor complete. Their intermingling of the expenses allocable to nonbusiness horses and their daughter's instruction with ostensible business expenses has already been noted. With a few exceptions, prize money was not recorded or reported. Petitioners claimed expenses for horse shows totaling $12,398 on

their returns for the period 1991 through 1996; they ultimately stipulated that the "known" amounts expended for horse shows for the period totaled $8,451, which indicates an overstatement exceeding 46 percent. Moreover, to the extent records were maintained, there is no evidence that they were utilized to improve the performance of a losing operation. Accordingly, we discount them as a factor. See Golanty v. Commissioner, supra at 430; Bessenyey v. Commissioner, 45 T.C. at 274; Sullivan v. Commissioner, T.C. Memo. 1998-367.

A change in operating methods or abandonment of unprofitable methods in a manner consistent with an intent to improve profitability may indicate a profit motive. See sec. 1.183-2(b)(1), Income Tax Regs. However, in the instant case, there is no convincing evidence that petitioners made modifications in their activity to improve profitability. Petitioners' failure to consider a replacement for their only brood mare has been discussed. Similarly, there is no convincing evidence that Dr. Hillman sought to improve on the record of breeding fees earned by his remaining stallions; i.e., those he did not have gelded. Dr. Hillman cited his "leasing" arrangement for Riskybiznis under which a trainer took on the costs of the horse's care, but any savings here--which were not documented--were almost certainly small in relation to petitioners' annual losses.

Overall, the numerous unbusinesslike practices engaged in by petitioners provide strong evidence of a lack of profit motive.

Expertise of Petitioners and Their Advisers

Preparation for an activity by extensive study or consultation with experts may indicate a profit motive where the taxpayer conducts the activity in accordance with such study or advice. See sec. 1.183-2(b)(2), Income Tax Regs. The record demonstrates that Dr. Hillman was involved with horses for 40 years and had become quite knowledgeable in the breeding of horses. Petitioners have also spent considerable sums to employ professional trainers for their horses (although as noted some of the trainers' time was spent instructing petitioners' daughter). Dr. Hillman testified that he consulted with others concerning the purchase of horses and delegated actual purchasing to them.

However, the mere fact that Dr. Hillman had skill in the breeding of horses and petitioners hired various experts does not prove that petitioners engaged in their show horse activity for profit. See Glenn v. Commissioner, T.C. Memo. 1995-399, affd. without published opinion 103 F.3d 129 (6th Cir. 1996). Expertise with respect to the breeding and showing of horses is to be distinguished from expertise in the economics of these undertakings. See, e.g., Burger v. Commissioner, 809 F.2d 355, 359 (7th Cir. 1987), affg. T.C. Memo. 1985-523; Sullivan v. Commissioner, supra; Glenn v. Commissioner, supra; see also

Golanty v. Commissioner, 72 T.C. at 432. A taxpayer's failure to obtain expertise in the economics of horse-related activities indicates a lack of profit motive. See Burger v. Commissioner, supra at 359. In this case, petitioners sought no professional advice on the economic aspects of the breeding and showing of horses. Dr. Hillman's discussions with his accountant focused on the tax aspects of petitioners' show horse activity.

Time and Effort Expended

The fact that the taxpayer devotes much of his or her personal time and effort to carrying on an activity, particularly if the activity does not have substantial recreational aspects, may indicate a profit motive. See sec. 1.183-2(b)(3), Income Tax Regs. Dr. Hillman testified that he spent "something over 500 hours" attending horse shows in 1993, and that the bookkeeping tasks associated with the show horse activity took approximately 2 to 3 hours per month. Dr. Hillman's testimony regarding time spent at horse shows is self-serving, uncorroborated, and not credible. The parties have stipulated that none of petitioners' horses participated in horse shows in 1993. Even putting aside this inconsistency, Dr. Hillman's estimate of "over 500 hours" appears scripted to meet respondent's alternative argument that the show horse activity was a section 469 "passive activity",

rather than recollected as a good faith estimate.[6]  Moreover, to the extent Dr. Hillman attended horse shows and otherwise oversaw the show horse activities, we believe the recreational aspects of these activities are manifest.  All or most of the onerous labor required in maintaining the horses--e.g., mucking stalls, feeding, etc.--was hired out and deducted as a business expense.

We do not believe that the time and the effort which petitioners have shown they dedicated to the show horse activity, particularly given its recreational aspects, support an inference that a profit motive existed.

Expectation That Assets May Appreciate

An expectation that assets used in the activity will appreciate in value may indicate a profit objective.  See sec. 1.183-2(b)(4), Income Tax Regs.  A profit motive may be inferred where there are no operating profits, so long as the appreciation in value of the activity's assets exceeds the operating expenses. See id.  The appreciation in value must be sufficient, however, to recoup the accumulated losses of prior years.  See Golanty v. Commissioner, supra at 427-428; Bessenyey v. Commissioner, 45

---

[6]  Treasury regulations provide that an individual taxpayer will be deemed to have "materially participated" in an activity (which precludes a finding that the activity was a "passive activity" for purposes of sec. 469) if the taxpayer participates in the activity for more than 500 hours during the taxable year. See sec. 1.469-5T(a)(1), Temporary Income Tax Regs., 53 Fed. Reg. 5725 (Feb. 25, 1988).

T.C. at 274; <u>Sullivan v. Commissioner</u>, T.C. Memo. 1998-367; <u>Dodge v. Commissioner</u>, T.C. Memo. 1998-89; <u>Taras v. Commissioner</u>, T.C. Memo. 1997-553.

The only evidence in the record of petitioners' horses' appreciation consists of Dr. Hillman's self-serving, uncorroborated estimates. No expert or other reliable evidence of value was introduced. Given that Dr. Hillman reported on his 1994 return that Ashley, a mare purchased 10 years earlier for $2,500 that suffered chronic uterine infections and had been donated to a veterinary school with a euthanasia authorization, had a fair market value of $4,800, we do not believe his estimates are entitled to significant weight.[7] Even if we accepted Dr. Hillman's value estimates, the appreciation experienced as of 1993--approximately $33,000, using his estimates--falls significantly short of petitioners' accumulated losses through 1993, which exceeded $51,000. Losses in excess of $17,000 occurred in each of the two succeeding years. Petitioners have failed to show that the appreciation in value of their assets creates any inference of profit motive.

---

[7] In addition, Dr. Hillman's asking price for Chicardo was $3,500, but the horse was ultimately sold for $1,800.

Past Success in Similar or Dissimilar Activities

A taxpayer's past success in similar or dissimilar activities is relevant in determining profit motive. See sec. 1.183-2(b)(5), Income Tax Regs. Dr. Hillman concedes that a previous effort at horse breeding was unsuccessful. Dr. Hillman did operate his medical practice successfully. While success in a dissimilar activity might weigh in petitioners' favor, given the substantial time that Dr. Hillman devoted to his medical practice, it is not clear that he spent significant time on the show horse activity. Accordingly, this factor is neutral. Cf. Surridge v. Commissioner, T.C. Memo. 1998-304.

The Activity's History of Income and Losses

An activity's history of income or loss may reflect whether the taxpayer has a profit motive. See sec. 1.183-2(b)(6), Income Tax Regs. Unless explained by customary business risks or unforeseen or fortuitous circumstances beyond the taxpayer's control, a record of continuous losses beyond the period customarily required to obtain profitability may indicate that the activity is not engaged in for profit. See id. A record of substantial losses over many years and the improbability of achieving a profitable operation are important factors bearing on a determination of profit motive. See Golanty v. Commissioner, supra at 426; Bessenyey v. Commissioner, 45 T.C. at 274.

Petitioners' show horse activity lost substantial sums every year for 6 years, aggregating at nearly $100,000. Apart from their somewhat vague business plan to "not start out large", petitioners have not claimed any specific startup period wherein losses are customary. Petitioners do assert that they experienced unforeseen adverse circumstances in the poor health and foaling difficulties encountered with Ashley. While Ashley's problems may not have been foreseeable, we think they fall well short of accounting for petitioners' losses. Ashley was acquired as a 2-year-old in 1984 and was old enough for breeding in 1986. Dr. Hillman testified that the horse miscarried three times in 4 years. But petitioners owned her for 10 years; they claimed her as part of their show horse activity in only 1 year. If petitioners had been engaged in a profit-seeking breeding activity, we believe they would have acted more promptly to address the problem of a nonperforming brood mare. Moreover, there is no evidence that they have acquired a brood mare during 2 years subsequent to the years in issue. We are left both with the impression that the record does not contain a full accounting of petitioners' experience with Ashley, and the conviction that any losses occasioned by Ashley's unforeseen problems do not satisfactorily explain the history of losses in this case. Petitioners' failure since 1994 either to acquire a new brood mare or to obtain any breeding fees from their stallions, and

their failure even to track their horse show winnings, suggests a certain indifference to the bottom line, and little probability that their operations will become profitable. Petitioners' history of losses, their inability to account for them, and their bleak prospects all suggest a lack of profit motive.

Amount of Occasional Profits

The amount of occasional profits, if large in relation to losses incurred or the taxpayer's investment, may indicate a profit motive. See sec. 1.183-2(b)(7), Income Tax Regs.

In this case, petitioners have never earned a profit from their show horse activity, and the evidence suggests that any future profits are unlikely.

Taxpayer's Financial Status

Substantial income from sources other than the activity, particularly if the losses from the activity generate substantial tax benefits, may indicate that the activity is not engaged in for profit, especially if there are personal or recreational elements involved. See sec. 1.183-2(b)(8), Income Tax Regs.

Dr. Hillman's earnings from his medical practice were $181,849 in 1993 and $142,362 in 1994 and never less than $142,362 annually from 1991 through 1996. Dr. Hillman's medical practice income allowed petitioners to sustain the losses from their show horse activity. Deducting these losses significantly reduced the after-tax cost of such activities to petitioners.

Cf. <u>Golanty v. Commissioner</u>, 72 T.C. at 429; <u>Sullivan v. Commissioner</u>, T.C. Memo. 1998-367.  When combined with the recreational elements present for Dr. Hillman and Denise, as well as petitioners' tendency to treat personal expenses for Denise's equine instruction and the care of "nonbusiness" horses as business expenses, we believe the after-tax economics of petitioners' show horse activity support an inference that the activity was not engaged in for profit.

<u>Personal Pleasure or Recreation</u>

The existence of recreational elements in an activity may indicate that the activity is not engaged in for profit; on the other hand, where an activity lacks any appeal other than profit, a profit motive may be indicated.  See sec. 1.183-2(b)(9), Income Tax Regs.

The record supports a finding that petitioners' recreational objectives were a significant component of petitioners' show horse activity.  Dr. Hillman has been involved with horses for 40 years.  Furthermore, Denise has been riding, showing, and caring for horses since she was 8 years old and enjoyed riding and grooming the horses included in petitioners' show horse activity. As previously noted, most of the onerous tasks of their horses' care were performed by hired help, the expenses of which were deducted.

Conclusion

Based on the foregoing, we conclude that petitioners have failed to show error in respondent's determination that their show horse activities in 1993 and 1994 were "not engaged in for profit" within the meaning of section 183(a).[8]

II.  Mileage Deductions

The second issue is whether petitioners are entitled to automobile mileage deductions in excess of the amounts determined by respondent.  In 1993 and 1994, Dr. Hillman deducted automobile mileage expenses for his medical practice in the respective amounts of $6,823 and $8,128 based on 24,368 miles at 28 cents per mile in 1993 and 28,027 miles at 29 cents per mile in 1994. Respondent determined that Dr. Hillman's allowable mileage expense deduction is limited to $3,636 (or 12,987 miles) and $4,308 (or 14,854 miles) for 1993 and 1994, respectively, on the grounds that petitioners failed to show that any greater amounts were for an ordinary and necessary business expense or were expended for the purpose designated.[9]

---

[8] Accordingly, we do not reach respondent's alternative contention that such activities constitute a "passive activity" within the meaning of sec. 469.

[9] Respondent makes no claim that these deductions are limited by virtue of sec. 274(d).  Because we conclude that petitioners have failed to prove error in respondent's determination under sec. 162(a), we need not address the application of sec. 274(d) in this case.

Deductions are a matter of legislative grace, and petitioners have the burden of proving their entitlement to them. See, e.g., Rule 142(a); INDOPCO, Inc. v. Commissioner, 503 U.S. 79, 84 (1992); Deputy v. Du Pont, 308 U.S. 488, 493 (1940); New Colonial Ice Co. v. Helvering, 292 U.S. 435, 440 (1934). Section 162(a)(2) allows a deduction for ordinary and necessary transportation expenses made in the pursuit of a trade or business paid or incurred during the taxable year, which may include the cost of operating a passenger automobile to the extent that it is used in a trade or business. See Rev. Proc. 93-51, 1993-2 C.B. 593. Taxpayers, however, must maintain records sufficient to substantiate deductions claimed. See Hradesky v. Commissioner, 65 T.C. 87, 89-90 (1975), affd. per curiam 540 F.2d 821 (5th Cir. 1976); sec. 1.6001-1(a), Income Tax Regs. A taxpayer's cost of commuting between his residence and his place of business or employment is a nondeductible personal expense, while the costs associated with travel between work assignments are deductible. See Heuer v. Commissioner, 32 T.C. 947 (1959), affd. per curiam 283 F.2d 865 (5th Cir. 1960); secs. 1.162-2(e), 1.262-1(b)(5), Income Tax Regs. Petitioners have not contended that Dr. Hillman's residence served as an office; accordingly, trips between his residence and any work site are nondeductible commuting expenses. See Sheldon v. Commissioner, 50 T.C. 24, 27 (1968).

The amounts claimed on petitioners' returns for automobile business mileage were computed using the standard mileage rate for the years in issue. See Rev. Proc. 93-51, 1993-2 C.B. 593; Rev. Proc. 92-104, 1992-2 C.B. 583. Although these revenue procedures permit taxpayers to use a per-mile estimate of automobile expenses in lieu of documenting actual expenses, taxpayers must still prove the actual business miles driven during the year. See Power v. Commissioner, T.C. Memo. 1990-583. Dr. Hillman testified that he provided estimates of his annual business mileage to his accountant by taking the change in the miles on his odometer for the year, and subtracting an amount equal to 24 miles per day (i.e., one round trip from his residence to his medical office) for each of the 4 days per week that he held office hours. Dr. Hillman did not maintain any mileage logs or similar documentation of his business use of an automobile and was unaware at the time of trial of the total mileage he drove during the years in issue.[10]

There are a number of problems with petitioners' attempt to prove additional business mileage. First, Dr. Hillman's testimony reveals that by counting only 4 days per week as

---

[10] Dr. Hillman's testimony also did not establish that he utilized a single vehicle exclusively for transportation in connection with his medical duties, although this position may be implicit in his testimony. Because we find petitioners' proof of additional business miles unavailing for other reasons, we need not pursue this particular infirmity.

involving commuting expense, he clearly underestimated the amount of nondeductible commuting mileage. Dr. Hillman elsewhere testified that he held office hours and performed operations at hospitals 4 to 5 days per week and made hospital rounds 5 to 6 days a week. Thus, on the additional 1 to 2 days per week that he made hospital rounds without holding office hours, he still had nondeductible commuting expenses in connection with the trip from his residence to the hospital, see Sheldon v. Commissioner, supra at 27, which have not been accounted for in his estimation methods.

Further, the record does not reveal what the distances were between Dr. Hillman's residence and the hospitals where he made rounds. Dr. Hillman testified that the distance between his residence and "the hospital" was about 12 miles, but according to his other testimony there were five hospitals at which he operated. Thus, there is no basis upon which we might estimate the additional commuting mileage.

Finally, we find Dr. Hillman's estimates improbable.[11] Even if we reduce Dr. Hillman's total business miles claimed by an additional 2 days per week of 24 commuting miles per day (or 2,492 miles per year), the result is that Dr. Hillman is

_____

[11] As noted previously, the incorrect representations regarding a horse's valuation on petitioners' 1994 return, among other inconsistencies, cast doubt on Dr. Hillman's testimony, and we therefore give it less weight in this context as well.

effectively claiming that he drove at least approximately 70 and 82 business miles per day on average in 1993 and 1994, respectively.[12] According to Dr. Hillman's testimony, his residence, medical offices, and the five hospitals at which he worked were all located in the Columbus, Ohio, area. There is no evidence of the distance between Dr. Hillman's office and the hospitals, between the hospitals themselves, or between Dr. Hillman's residence and four of the hospitals. Without such evidence there is no corroboration for Dr. Hillman's testimony, and we are not required to accept such self-serving testimony.

On this record, petitioners have failed to prove that the mileage amounts allowable in computing the section 162(a) deduction with respect to Dr. Hillman's medical practice are any greater than the amounts determined by respondent. See Russell v. Commissioner, T.C. Memo. 1989-326; Joint Implant Surgeons, Inc. v. Commissioner, T.C. Memo. 1988-558.

---

[12] Without accounting for holidays or vacations, a 6-day work week, as claimed by Dr. Hillman, generally results in 312 work days per year.

Dr. Hillman claimed 24,368 business miles in 1993. Subtracting the additional 2 days per week of commuting miles--namely, 2,492 miles annually--leaves 21,876 business miles over 312 days, or 70.1 business miles per day on average in 1993.

Dr. Hillman claimed 28,027 business miles in 1994. Subtracting an additional 2,492 commuting miles leaves 25,535 business miles over 312 days, or 81.8 business miles per day on average in 1994.

If one assumes that Dr. Hillman took any holidays or vacation days during the year, the average number of business miles per work day goes higher.

III. Accuracy-Related Penalty Under Sec. 6662

Respondent determined that an accuracy-related penalty under section 6662 applies to the entire underpayment[13] in both the 1993 and 1994 taxable years, based on negligence or disregard of rules or regulations.  See sec. 6662(a) and (b)(1).  Negligence for this purpose includes any failure to make a reasonable attempt to comply with the provisions of the Internal Revenue Code, and disregard includes any careless, reckless, or intentional disregard of rules or regulations.  See sec. 6662(c); sec. 1.6662-3(b), Income Tax Regs.  "Negligence" has been further defined as "a lack of due care or a failure to do what a reasonable person would do under the circumstances."  Leuhsler v. Commissioner, 963 F.2d 907, 910 (6th Cir. 1992), affg. T.C. Memo. 1991-179; see also Neely v. Commissioner, 85 T.C. 934, 947 (1985).  Petitioners have the burden of proving error in respondent's determination that these penalties apply.  See Rule 142(a); Leuhsler v. Commissioner, supra at 910.  The accuracy-related penalty under section 6662(a) does not apply, however, to any portion of an underpayment if it is shown that there was reasonable cause for such portion and that the taxpayer acted in good faith.  See sec. 6664(c)(1).  Reliance on professional

---

[13] For purposes of the instant case, the "underpayment" is the same as the "deficiency" in each year.  Compare sec. 6664(a) with sec. 6211(a).

advice may constitute reasonable cause for this purpose.  See sec. 1.6664-4(b)(1), Income Tax Regs.

Petitioners have failed to show error in respondent's negligence determination; the evidence amply supports a finding of negligence.  Petitioners' fundamental grounds for claiming a profit motive--that they expected to produce a small herd through breeding--is illogical in light of the fact that they never produced a foal or breeding fee during the years at issue or thereafter.  We believe that the obvious recreational benefits and the substantial losses that sheltered petitioners' other income combined to create a situation which should have seemed "too good to be true" to a reasonable and prudent person, within the meaning of section 1.6662-3(b)(1)(ii), Income Tax Regs.  See Smith v. Commissioner, T.C. Memo. 1997-503, affd. without published opinion ___ F.3d ___ (9th Cir., Apr. 28, 1999).  In addition, petitioners failed to allocate costs of feed and bedding and stable help between horses used in their show horse business and those conceded to be used for personal purposes only, and instead treated all such costs as business expenses.  Similarly, petitioners treated the cost of their daughter's equine instruction as if it were a business expense.  This indiscriminate deducting of obvious personal expenditures as business expenses demonstrates a lack of due care and a failure to make a "reasonable" attempt to comply with the provisions of

the Internal Revenue Code.  Cf. <u>Westbrook v. Commissioner</u>, 68 F.3d 868, 880-881 (5th Cir. 1995), affg. per curiam T.C. Memo. 1993-634.  Other aspects of their recordkeeping for the show horse activity were careless, as evidenced by their failure to record or report their horses' winnings, and their excess claims of horse show expenses in both years, including a claim of horse show expenses in 1993 despite a stipulation that none of their horses competed in shows that year.  A failure to maintain adequate books and records is evidence of negligence.  See sec. 1.6662-3(b)(1), Income Tax Regs.

Petitioners contend that they are not liable for the accuracy-related penalty under section 6662(a) for either of the years in issue because they relied on the advice of their accountant.  A taxpayer may demonstrate reasonable cause if he can show that he relied in good faith on a qualified adviser after full disclosure of all necessary and relevant information. See <u>Jackson v. Commissioner</u>, 86 T.C. 492, 539-540 (1986), affd. 864 F.2d 1521 (10th Cir. 1989); <u>Paula Constr. Co. v. Commissioner</u>, 58 T.C. 1055, 1061 (1972), affd. without published opinion 474 F.2d 1345 (5th Cir. 1973); sec. 1.6664-4(b)(1) and (c)(1)(i), Income Tax Regs.

In this case, petitioners have failed to establish that they fully disclosed all necessary and relevant information to their accountant, Mr. Adelman.  The record in this regard contains only

Dr. Hillman's self-serving and conclusory testimony that he discussed his show horse activity, and the applicable regulations, with Mr. Adelman.  Mr. Adelman was not called to testify.  The record demonstrates that the only records of the show horse activity provided to Mr. Adelman were yearend compilations or "bottom-line" figures, assembled by Dr. Hillman. Had Mr. Adelman been provided more complete disclosure, for example, he presumably would have advised Dr. Hillman of the necessity of allocating the expenses of the horses' upkeep between those horses used in the business and those not so used. One would also expect a fully informed professional to advise of the necessity of recording and reporting the horses' winnings, if a business were in fact being conducted.  We conclude that petitioners have failed to show that they made sufficient disclosure to their accountant to invoke the reasonable cause exception to the accuracy-related penalties.[14]

Petitioners have not addressed the portion of the underpayment attributable to the disallowance of certain of Dr. Hillman's business mileage deductions.  Accordingly, respondent's

---

[14] Petitioners also claim on brief that they had "substantial authority" for the positions taken on their returns. There is no "substantial authority" exception to the imposition of the accuracy-related penalty for negligence.  See Wheeler v. Commissioner, T.C. Memo. 1999-56.

determinations with respect to the accuracy-related penalties under section 6662(a) are sustained in their entirety.

We have considered all of petitioners' arguments and, to the extent not addressed above, have found them to be without merit.

To reflect the foregoing,

<u>Decision will be entered</u>

<u>for respondent</u>.