T.C. Memo. 2016-234

UNITED STATES TAX COURT

CECILIA M. HYLTON, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket Nos. 8887-13, 4955-14.          Filed December 22, 2016.

<u>Glen E. Frost</u>, <u>Kaitlyn A. Loughner</u>, <u>Bertram P. Husband</u>,

<u>Richard W. Craigo</u>, and <u>Jessica F. Marine</u>, for petitioner.

<u>Bradley C. Plovan</u>, <u>David A. Indek</u>, and <u>Nancy M. Gilmore</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

RUWE, <u>Judge</u>: These cases were consolidated for purposes of trial,

briefing, and opinion. Respondent determined deficiencies in petitioner's Federal

income tax, additions to tax, and accuracy-related penalties as follows:

**[*2]**                              Docket No. 8887-13

| Year | Deficiency | Addition to Tax Sec. 6651(a)(1) | Accuracy-Related Penalty Sec. 6662(a) |
|------|-----------|---------------------------------|----------------------------------------|
| 2004 | $287,857 | $71,964.25 | --- |
| 2005 | 352,702 | 88,175.50 | --- |
| 2006 | 607,521 | --- | $121,504.20 |
| 2007 | 641,005 | 135,169.75 | 128,201.00 |
| 2008 | 513,091 | 19,445.65 | 102,618.20 |
| 2009 | 269,707 | 8,161.25 | 53,941.40 |

Docket No. 4955-14

| Year | Deficiency | Addition to Tax Sec. 6651(a)(1) | Accuracy-Related Penalty Sec. 6662(a) |
|------|-----------|---------------------------------|----------------------------------------|
| 2010 | $493,302 | $24,446.40 | $98,660.40 |
| 2011 | 473,502 | 25,262.35 | 94,700.40 |

The issues for decision are: (1) whether petitioner's horse breeding, training, showing, and sales operation was an activity "not engaged in for profit" within the meaning of section 183 for the taxable years 2004-11 (years in issue); (2) whether petitioner is liable for additions to tax under section 6651(a)(1) for failure to timely file for the taxable years 2004-05 and 2007-11; and (3) whether petitioner is liable for accuracy-related penalties under section 6662(a) for the taxable years 2006-11.

**[\*3]**   Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

FINDINGS OF FACT

Some of the facts have been stipulated and are so found.  The first, second, and third stipulations of fact and the attached exhibits are incorporated herein by this reference.

At the time the petitions in these cases were filed, petitioner resided in Virginia.

<u>The Hylton Group</u>

Petitioner is the president of the Hylton Group, a successful real estate group founded by her father, Cecil Hylton,[1] primarily in the business of developing real property, building and selling residences and apartment buildings, and managing commercial and residential properties in Virginia.  The Hylton Group consists of several entities which collectively own at least five strip malls and approximately 1,000 apartment units in northern Virginia, as well as building contractors and other entities involved in real property development.  The Hylton

---

[1]Mr. Hylton was the primary executive of the Hylton Group and developed the first "satellite community", Dale City, Virginia.  He passed away in August 1989.

[*4] Group is a family business, and petitioner has been involved with various aspects of the business from a young age. During the years in issue petitioner normally worked at the Hylton Group's offices 10 hours every Wednesday. Petitioner has no formal education beyond high school. Petitioner's brothers manage the financial side of these companies.[2]

Petitioner's main sources of income for the years in issue were trusts holding the Hylton Group companies. Petitioner and her brothers control these trusts. At trial petitioner did not know her current net worth or her net worth in any year from 2004 to 2011.

Hylton Quarter Horses

Petitioner was exposed to horse ownership at a young age. When she was 12 years old, Mr. Hylton acquired for petitioner her first horse, whose name was Midnight. Following Mr. Hylton's death, petitioner purchased her first American Quarter Horse (quarter horse), Jimmers JJ, on October 27, 1990, because she "needed a shoulder to cry on, and the horse served that purpose." Petitioner paid $1,800 for Jimmers JJ. From 1990 to 1998 petitioner was mentored in horse riding and showing by professional horse trainer Connie Christopher.

---

[2]One of petitioner's brothers is now deceased.

**[*5]**  In 1998 petitioner started Hylton Quarter Horses (HQH),[3] which breeds, trains, shows, and sells quarter horses.  The predominant use for quarter horses is recreational riding, but they are also used in rodeos and horse shows and as working ranch horses.  At horse shows quarter horses compete in various disciplines, including:  reining, calf roping, western pleasure, ranch pleasure,[4] and other events.  Quarter horses are also shown in English disciplines and driving and are used in many other equestrian activities.

In operating HQH petitioner sought to raise the best horses possible. Petitioner's process to produce quality quarter horses involved the following: (1) accumulate the best mares; (2) acquire stallions to breed; (3) breed the mares; (4) produce foals; and (5) "cull" a portion of the foal crop and keep the remainder

---

[3]Petitioner's quarter horse operation was initially named Whipperwill Hill Quarter Horse Farm before changing its name to Hylton Quarter Horses.  For simplicity, we will refer to petitioner's operation throughout our opinion as HQH.

[4]The reining discipline involves quarter horses running in specified patterns and performing maneuvers such as sliding stops from runs and spins.  In the western pleasure discipline quarter horses are shown in groups and the emphasis is on "soft quiet slow" movements, including walking, jogging, and loping.  Ranch pleasure was added as a discipline in 2011 or 2012 and is a combination of various quarter horse disciplines.

[*6] to train.[5]  Petitioner did not prepare a written business plan when she started

HQH.  The record includes an undated five-page written "business plan" which

provides, inter alia, a general background about the quarter horse breed,

background information regarding petitioner's interest in quarter horses, goals of

HQH's breeding, training, and showing programs, and a single-page income and

expense projection.  According to petitioner, she never regarded this written

business plan as a true business plan; rather, her certified public accountant

(C.P.A.), Kenneth Anderson, developed it in response to the Internal Revenue

Service (IRS) audit.  The income and expense projection included in the business

plan covers the years 2011-15 and shows the following income, expenses, and

profit:

| Year | HQH Income Before Expenses | HQH Expenses | Profit (or loss) |
|------|---------------------------|--------------|------------------|
| 2011 | $250,000 | $934,000 | ($684,000) |
| 2012 | 500,000 | 954,000 | (454,000) |
| 2013 | 1,000,000 | 954,000 | 46,000 |
| 2014 | 1,300,000 | 1,043,000 | 257,000 |
| 2015 | 1,500,000 | 1,135,000 | 365,000 |

---

[5]"Cull" means to selectively reduce the size of the horse herd to get rid of the horses that do not fit into the breeding and/or training program.  In a normal crop of foals, petitioner would keep approximately half of the foals and cull the other half.  The culled foals would be either sold or donated to universities having equine programs.

[*7]   During the years in issue petitioner spent approximately 40 hours per week on HQH-related activities, such as:  researching horse bloodlines, attending horse sales and auctions, traveling to horse shows, observing HQH's training and breeding programs, making final decisions regarding culls, and reviewing invoices and signing checks.  Petitioner received no monetary compensation from HQH.  In February 2014 petitioner was inducted into the Virginia Quarter Horse Hall of Fame.

Petitioner's son, George Markley, serves as HQH's business manager and does not receive any compensation for his services.  Mr. Markley spends approximately 20 hours per week performing duties as HQH's business manager and is mainly responsible for monitoring the operation's finances.  Mr. Markley also attends horse shows and shows horses in the western pleasure discipline.

Mr. Markley is also employed as the general manager for Interstate Investment, an entity of the Hylton Group that manages commercial properties.  Mr. Markley works approximately 30 hours per week as the general manager of Interstate Investment and is paid a salary for his services.  During the years in issue, and to the present time, Mr. Markley resided at 11402 Kettle Run Road in Nokesville, Virginia.  Mr. Markley has no formal education beyond high school.

[*8] Petitioner's daughter, Jamie Hylton, serves as HQH's farm manager and does not receive any compensation for her services. Jamie Hylton works "about 40 hours" per week for HQH and is mainly responsible for recordkeeping, registration of horses, organization, and naming foals. For purposes of trial Jamie Hylton created rosters of HQH horses from 2004 to 2014 using horse registration records and veterinarian and training invoices.

During the years in issue petitioner operated HQH at four locations in northern Virginia (collectively, Virginia properties): (1) 11402 Kettle Run Road in Nokesville, which is owned by Mr. Markley; (2) 11212 Kettle Run Road in Nokesville, which is owned in trust with Mr. Markley as trustee;[6] (3) 13400 Herring Lane in Nokesville, which is owned in trust with Mr. Markley as trustee; and (4) 7705 and 7611 James Madison Highway in Gainesville, which are owned in trust with Mr. Markley as trustee. Petitioner's primary residence is at 7705 James Madison Highway. Petitioner primarily uses the Virginia properties for boarding and training of HQH show horses and generally does not provide any commercial boarding or training services to other horse owners.

---

[6]The properties at 11212 and 11402 Kettle Run Road are adjacent. Three of the Virginia properties are held in trust with Mr. Markley as trustee for estate planning purposes.

[*9]   The property at 11402 Kettle Run Road consists of 11.4533 acres.  One acre of this property consists of Mr. Markley's residence and the surrounding curtilage. Petitioner uses the remaining 10.4533 acres as the primary Virginia training facility for HQH show horses.  The property includes barns, stalls, run-ins, and indoor/outdoor training arenas.  The current fair market value of 11402 Kettle Run Road, excluding Mr. Markley's residence and the surrounding curtilage, is between $675,000 and $689,000.

The property at 11212 Kettle Run Road consists of 39.6186 acres.  In June 2001 this property was purchased for $165,000.  The current fair market value of 11212 Kettle Run Road is between $595,000 and $674,000.

The property at 13400 Herring Lane consists of seven acres.  One acre of this property consists of a single-family home and the surrounding curtilage. Petitioner's head trainer in Virginia resides in the single-family home, which petitioner provides as part of the trainer's compensation for services rendered to HQH.  The remaining six acres include barns, stalls, run-ins, and outdoor pastures which petitioner uses to house yearlings until they are ready to train under saddle. The current fair market value of 13400 Herring Lane, excluding the house and the surrounding curtilage, is between $275,000 and $316,000.

**[\*10]** The properties at 7705 and 7611 James Madison Highway have combined acreage of 16.4470 acres. One acre consists of petitioner's residence and the surrounding curtilage. The remaining 15.4470 acres include stables, pastures, run-ins, and buildings to store equipment for HQH. Petitioner also keeps her main HQH office above the stables at this location. The current fair market value of the combined properties, excluding petitioner's residence and the surrounding curtilage, is between $618,000 and $809,000.

Petitioner employs full-time horse trainers for HQH and, as part of the trainers' compensation packages, provides housing for them and their families at 13400 Herring Lane. From 2004 to 2012 petitioner contracted with Meadows Quarter Horses and its owners, Steve Meadows and his wife, to provide horse training and showing services. Mr. Meadows is a professional horseman based in Virginia and is a former president of the Virginia Quarter Horse Association, Chairman of the American Quarter Horse Association (AQHA)[7] Professional Horsemen's Council, a national director of the AQHA, and an AQHA Steward.

---

[7]Quarter horses are registered with the AQHA, which is a membership organization. The AQHA was formed in 1941 by a group of ranchers who were dedicated to forming a registry to preserve the pedigrees of quarter horses and develop rules for competitions. Petitioner is a member of the AQHA, the Virginia Quarter Horse Association, the Virginia Quarter Horse Youth Association, and the National Snaffle Bit Association. Petitioner registers her quarter horses with the AQHA.

[*11] From 2013 to the time of trial petitioner contracted with Lucas Cash Show Horses, LLC, and its owner Lucas Cash as the head trainer for HQH in Virginia. Mr. Cash is responsible for the day-to-day training of show horses in Virginia.

For each of the years in issue petitioner hired farmhands to "clean stalls and do * * * various clean-up around the farm". Petitioner paid the farmhands and provided them with a rented house to reside in while working for HQH. Petitioner did not issue either a Form W-2, Wage and Tax Statement, or a Form 1099-MISC, Miscellaneous Income, to any of the farmhands for any of the years in issue.

HQH advertises its operation in horse magazines and publications, on a Web site and a Facebook page, and by showing horses. During the years in issue petitioner attended approximately 10 horse shows per year with the average show lasting six to seven days (including travel time). In 2005 petitioner created a competition named the Hylton Maiden Class. To compete in the Hylton Maiden Class a horse must be at least three years old and not previously have been campaigned or shown. Petitioner's motivation in creating the Hylton Maiden Class was concern for the welfare of younger show horses and a desire to show that she "cared about * * * [her] horses and cared about all horses." Petitioner personally provides $50,000 in prize money for the winner of the Hylton Maiden Class in addition to the entry fees.

[*12] In 2006 petitioner purchased two motor coaches for use in conjunction with HQH's showing activities. The motor coaches were used to travel to and from horse shows and to reside in while at the shows. The first motor coach cost $850,000 and was purchased for petitioner's use, and the second motor coach cost $950,000 and was purchased for Mr. Markley's use. When attending horse shows, petitioner and an assistant would stay in her motor coach and Mr. Markley would stay by himself in his motor coach. If petitioner and Mr. Markley both attended the same horse show, they would each bring their respective motor coaches in order to have privacy. On July 14, 2006, petitioner completed an application for insurance coverage on Mr. Markley's motor coach and indicated therein that the motor coach would not be used in connection with a business. Petitioner began taking depreciation deductions on the motor coaches in 2006.

Petitioner's quarter horse breeding program included acquiring stallions. In 2000 petitioner paid $100,000 for a world champion stallion named Flashy Zipper and four mares; however, Flashy Zipper died the same year.[8] After Flashy Zipper died, petitioner had a veterinarian remove his testicles and ship them to Colorado

---

[8]During the years in issue petitioner selectively insured her highest valued horses for risks against death and injury. She determined these values annually. Petitioner collected $100,000 in insurance proceeds from the death of Flashy Zipper and $150,000 from the death of another horse, Impulse to Sparkle.

[*13] State University to harvest and freeze his semen. Petitioner artificially inseminates HQH mares using Flashy Zipper's semen and will not sell the semen outside of the HQH breeding program.

HQH uses embryo transfer in its breeding program, which is the process of transplanting an embryo into a surrogate mare to enable the biological dam (i.e., the mother horse) to continue competing in shows. HQH also uses embryo transfers in the case of older mares who are valuable but are unable to carry a foal to term (11 months).

HQH currently owns three stallions; two were purchased and one was bred by HQH. HQH currently charges stud fees for these stallions of $1,000, $1,250, and $1,500, respectively. HQH also uses non-HQH stallions to breed its mares.

Sometime after 2005 petitioner decided to move some of HQH's breeding horses to Whitesboro, Texas, because it is "the premier show place" of quarter horses and the location of breeding experts. Petitioner keeps mares, colts, and her three stallions in Texas. Petitioner contracts with three entities in Whitesboro, Texas: (1) Knabenshue Performance Horses, LLC (Knabenshue); (2) MC Equine Enterprises, LLC (MC Equine); and (3) Cedar Ridge Stallion Station/Casey Hinton Quarter Horses (Cedar Ridge). Knabenshue manages HQH's stallions; if a third party is interested in breeding an HQH stallion, they call Knabenshue. HQH

[*14] keeps mares and foals at MC Equine, which is responsible for the collection and shipping of semen.  Cedar Ridge specializes in reining horses, and petitioner keeps her world champion reining stallion at this location.  Petitioner usually travels to Texas once per year to observe the HQH breeding program and stays for approximately one week each trip.

During the years in issue petitioner maintained a separate mailing address for HQH at a post office box in Gainesville, Virginia.  Petitioner maintained a separate checking account for HQH with Wachovia/Wells Fargo for HQH expenses (checking account), which was funded by her.  The checking account was used to pay most of HQH's major expenses, such as feed, trainers, veterinarians, and blacksmiths.  Petitioner had signatory authority over the checking account.  Petitioner maintained a separate brokerage account for HQH with Edward Jones (brokerage account), which was used to pay show fees, camping fees, and any other expenses that would arise at horse shows.  Petitioner, Mr. Markley, Jamie Hylton, and the head trainer had signatory authority over the brokerage account.  Mr. Markley would prepare checks for payment of HQH expenses and petitioner would sign them.

Petitioner, Mr. Markley, Jamie Hylton, and HQH's head trainer would typically meet "once a month, sometimes more" to review HQH's invoices and

[*15] receipts. No minutes or records were kept of these meetings. Mr. Markley kept HQH's invoices and receipts in files at Interstate Investment and would provide these documents to petitioner's tax return preparer in order to prepare returns.

Petitioner hired Kenneth Anderson,[9] of Anderson, Stone & Co., Ltd. P.C., to prepare and file her Forms 1040, U.S. Individual Income Tax Return, for the years in issue. The following table summarizes the income petitioner reported on her Forms 1040 for the taxable years 1998-2014, exclusive of income/loss from HQH:

| Year | Non-HQH Income |
|------|----------------|
| 1998 | $3,722,690 |
| 1999 | 6,045,704 |
| 2000 | 5,184,803 |
| 2001 | 6,503,147 |
| 2002 | 11,245,881 |
| 2003 | 11,816,699 |
| 2004 | 11,162,448 |
| 2005 | 12,988,669 |
| 2006 | 5,161,913 |
| 2007 | 2,276,623 |
| 2008 | 1,575,492 |
| 2009 | 1,135,395 |
| 2010 | 1,357,398 |
| 2011 | 1,958,370 |
| 2012 | 2,063,578 |
| 2013 | 3,070,689 |
| 2014 | 1,828,418 |
| Total | 89,097,917 |

[9]Mr. Anderson had prepared petitioner's tax returns since approximately 1991 and continued doing so until his death on June 1, 2013.

[*16] Petitioner reported all income and expenses from the operation of HQH on Schedules F, Profit or Loss From Farming. Mr. Anderson prepared the Schedules F on the basis of invoices and income information he received from Mr. Markley. The following table summarizes HQH's gross income before expenses, total expenses, and net profit or loss as reported by petitioner on Schedules F for the taxable years 1998-2014:

| Year | HQH Gross Income Before Expenses | HQH Expenses | Net Profit (or loss) |
|---|---|---|---|
| 1998 | $508 | $204,684 | ($204,176) |
| 1999 | 8,964 | 446,861 | (437,897) |
| 2000 | 11,447 | 460,783 | (449,336) |
| 2001 | 87,730 | 637,951 | (550,221) |
| 2002 | 6,045 | 840,432 | (834,387) |
| 2003 | 24,920 | 1,091,811 | (1,066,891) |
| 2004 | 203,528 | 792,420 | (588,892) |
| 2005 | 50,908 | 988,652 | (937,744) |
| 2006 | 61,742 | 1,711,902 | (1,650,160) |
| 2007 | 39,554 | 2,039,248 | (1,999,694) |
| 2008 | 150,437 | 2,057,836 | (1,907,399) |
| 2009 | 12,341 | 1,625,097 | (1,612,756) |
| 2010 | 109,127 | 1,558,623 | (1,449,496) |
| 2011 | 102,975 | 1,202,276 | (1,099,301) |
| 2012 | 176,779 | 1,143,553 | (966,774) |
| 2013 | 35,492 | 716,086 | (680,594) |
| 2014 | 196,829 | 1,139,936 | (943,107) |
| Total | 1,279,326 | 18,658,151 | (17,378,825) |

Petitioner used HQH losses (as reported on Schedules F) to offset her non-HQH income as follows:

[*17]

| Year | Non-HQH Income | Schedule F Loss from HQH | Total Income Reported |
|------|----------------|--------------------------|-----------------------|
| 1998 | $3,722,690 | ($204,176) | $3,518,514 |
| 1999 | 6,045,704 | (437,897) | 5,607,807 |
| 2000 | 5,184,803 | (449,336) | 4,735,467 |
| 2001 | 6,503,147 | (550,221) | 5,952,926 |
| 2002 | 11,245,881 | (834,387) | 10,411,494 |
| 2003 | 11,816,699 | (1,066,891) | 10,749,808 |
| 2004 | 11,162,448 | (588,892) | 10,573,556 |
| 2005 | 12,988,669 | (937,744) | 12,050,925 |
| 2006 | 5,161,913 | (1,650,160) | 3,511,753 |
| 2007 | 2,276,623 | (1,999,694) | 276,929 |
| 2008 | 1,575,492 | (1,907,399) | (331,907) |
| 2009 | 1,135,395 | (1,612,756) | (477,361) |
| 2010 | 1,357,398 | (1,449,496) | (92,098) |
| 2011 | 1,958,370 | (1,099,301) | 859,069 |
| 2012 | 2,063,578 | (966,774) | 1,096,804 |
| 2013 | 3,070,689 | (680,594) | 2,390,095 |
| 2014 | 1,828,418 | (943,107) | 885,311 |
| Total | 89,097,917 | (17,378,825) | 71,719,092 |

The record includes copies of petitioner's tax returns for the taxable years 2004-11, which are signed and dated by Mr. Anderson as the return preparer. Petitioner's 2004 tax return shows a preparation date of January 29, 2009; petitioner's 2005 tax return shows a preparation date of July 11, 2009; petitioner's 2006 tax return shows a preparation date of July 11, 2009; petitioner's 2007 tax return shows a preparation date of July 12, 2009; petitioner's 2008 tax return shows a preparation date of October 12, 2009; petitioner's 2009 tax return shows a preparation date of October 12, 2010; petitioner's 2010 tax return shows a

[*18] preparation date of October 16, 2011; and petitioner's 2011 tax return shows a preparation date of October 14, 2012. Mr. Anderson created financial statements for HQH for each of the years in issue solely for the purpose of preparing petitioner's tax returns. The financial statements were created on the basis of petitioner's check register and other third-party documents, such as invoices, statements, bills, and credit card receipts. The financial statements were given to Mr. Markley after the filing of petitioner's tax returns, and he did not use them for business planning. Petitioner had not seen the financial statements before trial and did not use them for business planning.

Respondent issued to petitioner separate notices of deficiency on January 24, 2013, and February 7, 2014, respectively,[10] disallowing her claimed losses from the operation of HQH for the years in issue. Petitioner timely filed a petition with the Court disputing respondent's determination.

OPINION

Respondent determined that petitioner's ownership and operation of HQH was an activity "not engaged in for profit" within the meaning of section 183 and disallowed loss deductions claimed on her Schedules F for the years in issue. A

---

[10]The first notice of deficiency is for the taxable years 2004-09 and forms the basis of the case at docket No. 8887-13. The second notice of deficiency is for the taxable years 2010-11 and forms the basis of the case at docket No. 4955-14.

**[*19]** taxpayer may not fully deduct expenses regarding an activity under section 162 or 212 if the activity is not engaged in for profit. Sec. 183(a), (c); see also Keanini v. Commissioner, 94 T.C. 41, 45 (1990). Pursuant to section 183(a), if an activity is not engaged in for profit, no deduction attributable to that activity is allowed except to the extent provided by section 183(b). In relevant part, section 183(b) allows deductions that would have been allowable had the activity been engaged in for profit but only to the extent of gross income derived from the activity (reduced by deductions attributable to the activity that are allowable without regard to whether the activity was engaged in for profit). Section 183(c) defines an activity not engaged in for profit as "any activity other than one with respect to which deductions are allowable for the taxable year under section 162 or under paragraph (1) or (2) of section 212."

Deductions are allowed under section 162 for the ordinary and necessary expenses of carrying on an activity which constitutes the taxpayer's trade or business. Deductions are allowed under section 212 for expenses paid or incurred in connection with an activity engaged in for the production or collection of income or for the management, conservation, or maintenance of property held for the production of income. With respect to either section, the taxpayer must demonstrate a profit objective for the activities in order to deduct associated

[*20] expenses. Jasionowski v. Commissioner, 66 T.C. 312, 320-322 (1976); Collins v. Commissioner, T.C. Memo. 2011-37, 2011 Tax Ct. Memo LEXIS 31, at *7-*8; sec. 1.183-2(a), Income Tax Regs. The profit standard applicable to section 212 is the same as that used in section 162. See Antonides v. Commissioner, 893 F.2d 656, 659 (4th Cir. 1990), aff'g 91 T.C. 686 (1988); Allen v. Commissioner, 72 T.C. 28, 33 (1979). The Supreme Court has held that for deductions to be allowable under section 162, the "primary purpose" for engaging in the activity must be for profit. Antonides v. Commissioner, 893 F.2d at 659 (citing Commissioner v. Groetzinger, 480 U.S. 23, 35 (1987)); see also Filios v. Commissioner, 224 F.3d 16, 21 (1st Cir. 2000), aff'g T.C. Memo. 1999-92; Westbrook v. Commissioner, 68 F.3d 868, 875 (5th Cir. 1995), aff'g T.C. Memo. 1993-634.

Under section 183(d), an activity that consists in major part of the breeding, training, showing, or racing of horses is presumed to be engaged in for profit if the activity produces gross income in excess of the deductions for any two of seven consecutive years unless the Commissioner establishes to the contrary. See also Wadlow v. Commissioner, 112 T.C. 247, 250 (1999). Petitioner's ownership and operation of HQH did not produce income in excess of its deductions at any time during its operation. Accordingly, the presumption does not apply in these cases.

**[\*21]** Whether the required profit objective exists is to be determined on the basis of all the facts and circumstances of each case. Golanty v. Commissioner, 72 T.C. 411, 426 (1979), aff'd without published opinion, 647 F.2d 170 (9th Cir. 1981); Embroidery Express, LLC v. Commissioner, T.C. Memo. 2016-136, at \*28; sec. 1.183-2(a), Income Tax Regs. We give greater weight to objective facts than to the taxpayer's statement of intent. See sec. 1.183-2(a), Income Tax Regs.; see also Keating v. Commissioner, 544 F.3d 900, 904 (8th Cir. 2008), aff'g T.C. Memo. 2007-309. Evidence from years after the years in issue is relevant to the extent it creates inferences regarding the taxpayer's requisite profit objective in earlier years. See, e.g., Foster v. Commissioner, T.C. Memo. 2012-207; Bronson v. Commissioner, T.C. Memo. 2012-17, 2012 Tax Ct. Memo LEXIS 18, aff'd, 591 F. App'x 625 (9th Cir. 2015).

The taxpayer generally bears the burden of proving that the requisite profit objective exists. See Rule 142(a); see also Westbrook v. Commissioner, 68 F.3d at 876. Pursuant to section 7491(a), the burden of proof on factual issues may shift to the Commissioner where the taxpayer complies with certain requirements. Petitioner argues that the burden of proof should shift to respondent. Because our conclusions are based on a preponderance of the evidence, the allocation of the burden of proof in these cases is immaterial. See Foster v. Commissioner, 138

[*22] T.C. 51, 53 n.4 (2012); McGowen v. Commissioner, T.C. Memo. 2011-186, 2011 Tax Ct. Memo LEXIS 185, at *5 n.3.

Section 1.183-2(b), Income Tax Regs., provides a nonexhaustive list of the following nine factors used to determine whether an activity is engaged in for profit: (1) whether the taxpayer carries on the activity in a businesslike manner; (2) the expertise of the taxpayer or his or her advisors; (3) the time and effort expended by the taxpayer in carrying on the activity; (4) the expectation that the assets used in the activity may appreciate in value; (5) the success of the taxpayer in carrying on other similar or dissimilar activities; (6) the taxpayer's history of income or losses with respect to the activity; (7) the amount of occasional profits, if any, which are earned; (8) the taxpayer's financial status; and (9) elements of personal pleasure or recreation. All facts and circumstances are to be taken into account, and no single factor is determinative. Id.; see also Keating v. Commissioner, 544 F.3d at 904. We will consider each of these factors in turn.

1. Businesslike Manner

The regulations under section 183 provide that carrying on an activity in a businesslike manner may indicate a profit objective. Sec. 1.183-2(b)(1), Income Tax Regs. The regulations explain that businesslike operations typically involve the maintenance of complete and accurate books and records, the conduct of the

[*23] activity in a manner similar to profitable businesses of the same nature, and changes to improve operations and profitability. Id. Numerous court opinions also provide that a businesslike manner includes the preparation of a business plan and a consistent and concentrated advertising program. See Bronson v. Commissioner, 2012 Tax Ct. Memo LEXIS 18, at *19; see also Keating v. Commissioner, T.C. Memo. 2007-309; Dodge v. Commissioner, T.C. Memo. 1998-89, aff'd without published opinion, 188 F.3d 507 (6th Cir. 1999). Some aspects of petitioner's ownership and operation of HQH display a businesslike manner, while others do not.

Petitioner's books and records for HQH consisted of a check register and hard copies of third-party documentation, such as bills, invoices, statements, and receipts. Petitioner provided this information to her C.P.A., Mr. Anderson, for use in preparing her tax returns. Mr. Anderson used this information to create certain financial statements (e.g., profit and loss statements); however, the financial statements were given to Mr. Markley only after the filing of petitioner's tax returns and were not used by petitioner or anyone else to analyze HQH's profitability or expenses. Petitioner did not maintain income and expense records for each horse and did not keep current or historical rosters of her horses. Jamie Hylton prepared yearly horse rosters for the years 2004 through 2014 by reviewing

[*24] registration records and other invoices, but these records were compiled solely for purposes of trial. Mr. Markley and Jamie Hylton served as HQH's business manager and farm manager, respectively, but did not receive compensation for their services. Petitioner hired farmhands to help tend to her horses for each of the years in issue but did not issue either a Form 1099 or a Form W-2 reporting wages paid to any of these workers.

Despite investing considerable financial resources into HQH, petitioner did not prepare a written business plan when she started HQH and testified that she kept a business plan only "in * * * [her] head." The record before the Court includes a written business plan; however, Mr. Anderson developed this business plan in response to the IRS's audit, and petitioner never regarded this document as a true business plan or used it to help manage HQH operations.

Petitioner's purchase of two motor coaches in 2006 is also not indicative of a businesslike manner. Petitioner testified that she recognized an impending economic downturn in the quarter horse market as early as 2005. Despite this prediction petitioner purchased two motor coaches for amounts totaling $1.8 million, which exceeds HQH's total revenues from 1998 to 2014. Petitioner and Mr. Markley explained in general terms that the motor coaches were purchased to reduce travel costs; however, petitioner did not offer detailed expense projections

[*25] or any other credible evidence to support this claim. Furthermore, the financial statements that Mr. Anderson prepared show that travel-related costs (exclusive of depreciation) increased substantially after 2005, when the motor coaches were placed into service.

On the other hand, some aspects of petitioner's ownership and operation of HQH were indicative of a businesslike manner. For instance, petitioner had a separate checking account, brokerage account, and mailing address for HQH. Furthermore, petitioner advertised HQH in horse publications, on a Web site and a Facebook page, and at horse shows. Although petitioner advertised for HQH, a characteristic indicative of a businesslike operation, she provided no credible evidence that HQH engaged in substantial and concentrated advertising unrelated to horse shows (e.g., the breeding program or horse sales). See, e.g., Engdahl v. Commissioner, 72 T.C. 659, 667 (1979).

2. Expertise of Taxpayer or Advisers

Preparation for an activity by extensive study or consultation with experts may indicate a profit objective when the taxpayer carries on the activity as advised. Sec. 1.183-2(b)(2), Income Tax Regs. When analyzing profit objective, expertise with respect to the breeding of horses should be distinguished from expertise in the economics of the business. Bronson v. Commissioner, 2012 Tax

**[\*26]** Ct. Memo LEXIS 18, at \*26 (citing Golanty v. Commissioner, 72 T.C. at 432).

Petitioner has been involved with horses since she was 12 years old and has owned and operated HQH since 1998.  There is no question that petitioner has extensive knowledge about the quarter horse breed and can develop successful show horses.  However, HQH has never made a profit in any year since its formation, and there is no credible evidence indicating that petitioner sought or received financial advice from experts on the business end of the activity.  See Burger v. Commissioner, T.C. Memo. 1985-523, 1985 Tax Ct. Memo LEXIS 107, at \*18-\*19, aff'd, 809 F.2d 355 (7th Cir. 1987).

3.  Time and Effort

The fact that the taxpayer devotes much of his or her personal time and effort to carrying on an activity, particularly if the activity does not have substantial personal or recreational aspects, may indicate a profit objective.  Sec. 1.183-2(b)(3), Income Tax Regs.  Petitioner spent a substantial amount of time in connection with the operation of HQH.  However, petitioner's activities with HQH entail significant personal and recreational aspects.

**[\*27]** 4. <u>Expectation of Asset Appreciation</u>

An expectation that assets used in the activity will appreciate may indicate a profit objective even if the taxpayer derives no profit from the current operations. Sec. 1.183-2(b)(4), Income Tax Regs. The appreciation of the activity's assets must exceed operating expenses and be sufficient to recoup the accumulated losses of prior years. See <u>Hillman v. Commissioner</u>, T.C. Memo. 1999-255, 1999 Tax Ct. Memo LEXIS 293, at \*27.

Petitioner argues that she expects the Virginia properties and HQH's quarter horses to appreciate. Petitioner did not offer any credible evidence as to the specific measurement of appreciation she expects with respect to the properties and the quarter horses. Furthermore, petitioner does not contend that the expected appreciation of the properties and horses will recoup HQH's accumulated losses, which exceed $17 million from 1998 to 2014.

5. <u>Success in Similar or Dissimilar Activities</u>

A taxpayer's past success in similar or dissimilar activities is relevant in determining profit objective. Sec. 1.183-2(b)(5), Income Tax Regs. Petitioner did not engage in a horse breeding, training, showing, and sales operation before she started HQH in 1998. Petitioner works 10 hours each week as the president of the Hylton Group and earns substantial income from the Hylton Group companies.

[*28] The Hylton Group is undoubtedly a successful family business founded by petitioner's father; however, it is impossible to parse out and measure petitioner's contributions to the development and ongoing success of the Hylton Group.

6. History of Income/Losses and Amount of Occasional Profits

While a series of losses during the initial or startup stage of an activity may not necessarily indicate a lack of profit objective, a record of large losses over many years and the unlikelihood of achieving profitability are persuasive evidence that a taxpayer did not have such an objective. See Golanty v. Commissioner, 72 T.C. at 426; sec. 1.183-2(b)(6), Income Tax Regs. The amount of profits in relation to the amount of losses incurred may provide useful criteria in determining the taxpayer's intent. Sec. 1.183-2(b)(7), Income Tax Regs.

Petitioner's ownership and operation of HQH generated substantial losses from 1998 to 2014, which she used to offset taxable income from other sources. Although losses in the formative years of a business are not inconsistent with a profit objective, the goal must be to realize a profit on the entire operation, which presupposes sufficient future net earnings from the activity to recoup the losses. See Golanty v. Commissioner, 72 T.C. at 427. In the present case, petitioner owned and operated HQH for 17 years and claimed losses of $17,378,825

**[*29]** compared with reporting gross income before expenses of $1,279,326 over the same period.

7. Financial Status of Taxpayer

Substantial income from sources other than the activity (particularly if the losses from the activity generate substantial tax benefits) may indicate that the activity is not engaged in for profit, especially if there are personal or recreational elements involved. Sec. 1.183-2(b)(8), Income Tax Regs. From 1998 to 2014 petitioner received $89,097,917 in non-HQH income. Petitioner claimed sizable tax benefits from the losses generated by HQH.

8. Personal Pleasure or Recreation

The existence of recreational elements or personal motives with respect to an activity may indicate a lack of profit objective. Sec. 1.183-2(b)(9), Income Tax Regs. On the other hand, a profit objective may be indicated where an activity lacks any appeal other than profit. Id. There is no question that petitioner is a quarter horse enthusiast who has enjoyed horse-related activities since she was 12 years old. At trial petitioner spoke affectionately of the quarter horse breed. Although some activities associated with petitioner's ownership and operation of HQH could indicate a profit objective, they are equally consistent with an avid and costly hobby that provides her with recreation and personal enjoyment that she

**[*30]** could well afford. This is illustrated by petitioner's purchase of two "nicely appointed" motor coaches in 2006, one year after she identified an impending economic downturn in the quarter horse industry. Petitioner contends that she paid $1.8 million for two motor coaches for business reasons, i.e., to save on travel expenses and to use as meeting locations for prospective customers at horse shows. However, traveling to horse shows and residing in expensive motor coaches clearly has a personal or recreational element, and petitioner provided no evidence or analysis regarding what financial benefit, if any, that she expected would result from the purchase/use of motor coaches versus other means of transportation. Indeed, as previously discussed, the financial statements for HQH show increased travel costs (exclusive of depreciation) after the motor coaches were purchased.

In order to prevail, petitioner must show that she owned and operated HQH "primarily" for the purpose of making a profit. See Warden v. Commissioner, T.C. Memo. 1995-176, 1995 Tax Ct. Memo LEXIS 170, at *24, aff'd, 111 F.3d 139 (9th Cir. 1997). Where a taxpayer has both personal and profit objectives for engaging in an activity, it is our task to determine which was primary. Id., 1995 Tax Ct. Memo LEXIS 170, at *26-*27; see also Antonides v. Commissioner, 893 F.2d at 659 (citing Commissioner v. Groetzinger, 480 U.S. at 35). The evidence

[*31] adduced at trial is more consistent with the conclusion that petitioner has a passion for quarter horses and also has ample financial resources to own and operate a quarter horse activity to further her personal pleasure regardless of the consistent large losses.[11]  Therefore, we find that petitioner's profit objective was not the primary or dominant reason for engaging in her quarter horse activity. Accordingly, we hold that petitioner's ownership and operation of HQH was not engaged in for profit within the meaning of section 183(c).

---

[11]One Court of Appeals has suggested that

> the Tax Court would be better off if rather than wading through the nine factors it said simply that a business that is in an industry known to attract hobbyists (and horse racing is that business par excellence), and that loses large sums of money year after year that the owner of the business deducts from a very large income that he derives from other (and genuine) businesses or from trusts or other conventional sources of income, is presumptively a hobby, though before deciding for sure the court must listen to the owner's protestations of business motive.  For an analysis along these lines see our decision in Estate of Stuller v. United States, 811 F.3d 890, 896-98 (7th Cir. 2016).

Roberts v. Commissioner, 820 F.3d 247, 254 (7th Cir. 2016), rev'g T.C. Memo. 2014-74.  Using this abbreviated analysis leads us to the same conclusion.

**[*32]** Additions to Tax

Respondent determined that petitioner is liable for additions to tax pursuant to section 6651(a)(1) for the taxable years 2004-05 and 2007-11. Respondent has the burden of production with respect to these additions to tax. See sec. 7491(c). To meet this burden, respondent must produce evidence showing that the additions to tax are appropriate. See id.; Higbee v. Commissioner, 116 T.C. 438, 446 (2001). Once respondent satisfies this burden, petitioner has the burden of proof with respect to exculpatory factors such as reasonable cause. See Higbee v. Commissioner, 116 T.C. at 446-447.

Section 6651(a)(1) imposes an addition to tax when a taxpayer fails to file a timely return unless the taxpayer establishes that the failure was due to reasonable cause and not due to willful neglect. The addition to tax is equal to 5% of the amount required to be shown as tax on the delinquent return for each month or fraction thereof during which the return remains delinquent, up to a maximum addition of 25% for returns more than four months delinquent. Id.

To meet his burden of production, respondent relies on (1) filing dates stated in the notices of deficiency which are used to calculate the additions to tax under section 6651(a)(1), and (2) copies of petitioner's tax returns. The filing dates in the notices of deficiency are insufficient to satisfy respondent's burden of

[*33] production under section 7491(c) because they are merely a summary of his position. Respondent did not introduce any credible evidence, such as certified account transcripts, to support the filing dates used in the notices of deficiency. Thus, the filing dates in the notices of deficiency are insufficient to satisfy respondent's burden of production under section 7491(c).

The parties introduced into evidence copies of petitioner's 2004-11 Federal tax returns, which were prepared and signed by Mr. Anderson and filed with the IRS. The following table summarizes the due date of each return and the date shown on each return as the date Mr. Anderson signed the return:[12]

| Year | Due Date | Date Mr. Anderson Signed Return |
|------|----------|--------------------------------|
| 2004 | 10/15/2005 | 1/29/2009 |
| 2005 | 10/15/2006 | 7/11/2009 |
| 2007 | 10/15/2008 | 7/12/2009 |
| 2008 | 10/15/2009 | 10/12/2009 |
| 2009 | 10/15/2010 | 10/12/2010 |
| 2010 | 10/15/2011 | 10/16/2011 |
| 2011 | 10/15/2012 | 10/14/2012 |

---

[12]Petitioner's signature does not appear on the copies of the returns in evidence.

[*34] The dates shown on petitioner's tax returns for 2004, 2005, and 2007[13] are after the respective due dates, and it follows logically that these returns could not have been timely filed. Because the parties stipulate that these are true and correct copies of petitioner's filed tax returns, we find that respondent has met his burden of production under section 7491(c) as to the tax years 2004, 2005, and 2007.[14]

Petitioner has not provided evidence sufficient for us to find that her failure to timely file for 2004, 2005, and 2007 was due to reasonable cause. Accordingly, we hold that petitioner is liable for additions to tax under section 6651(a)(1) for these three years. The amounts of the section 6651(a)(1) additions to tax will be computed by the parties in a Rule 155 computation using the dates shown on petitioner's tax returns, not the dates in the notices of deficiency.

Accuracy-Related Penalties

Respondent determined that petitioner is liable for section 6662(a) accuracy-related penalties for the taxable years 2006-11 of $121,504.20,

---

[13]Petitioner's 2010 tax return was due on October 15, 2011, which is a Saturday. Accordingly, this return would be considered timely filed on or before Monday, October 17, 2011. See sec. 7503.

[14]Because the 2008, 2009, 2010, and 2011 tax returns are dated before the respective due dates--and because respondent failed to offer any other evidence to establish the filing dates for these returns--we find that respondent did not meet his burden of production under sec. 7491(c) as to these years.

**[*35]** $128,201.00, $102,618.20, $53,941.40, $98,660.40, and $94,700.40,

respectively. Section 6662(a) imposes an accuracy-related penalty equal to 20%

of the underpayment to which section 6662 applies. Section 6662 applies to the

portion of any underpayment which is attributable to, among other things, a

substantial understatement of income tax. Sec. 6662(b)(2).

Section 7491(c) provides that the Commissioner bears the "burden of

production" with regard to penalties and must come forward with sufficient

evidence indicating that it is appropriate to impose the penalty. See Higbee v.

Commissioner, 116 T.C. at 446. Once the Commissioner meets his "burden of

production", however, the "burden of proof" remains with the taxpayer, including

the burden of proving that the penalty is inappropriate because of reasonable cause

under section 6664. See Rule 142(a); Higbee v. Commissioner, 116 T.C. at 446-

448.

There is a substantial understatement of income tax for any taxable year if

the amount of the understatement exceeds the greater of 10% of the tax required to

be shown on the return for the taxable year or $5,000. Sec. 6662(d)(1)(A). The

understatement of income tax for each of the tax years 2006-11 exceeds the greater

of 10% of the tax required to be shown on the return or $5,000. Therefore,

petitioner's understatements are substantial. Consequently, for those years we

**[*36]** conclude that respondent has met his burden of production with respect to petitioner's substantial understatements of income tax.

Section 6664(c)(1) provides that the penalty under section 6662(a) shall not apply to any portion of an underpayment if it is shown that there was reasonable cause for the taxpayer's position and that the taxpayer acted in good faith with respect to that portion. See Higbee v. Commissioner, 116 T.C. at 448. The determination of whether the taxpayer acted with reasonable cause and in good faith is made on a case-by-case basis, taking into account all the pertinent facts and circumstances. Sec. 1.6664-4(b)(1), Income Tax Regs. Petitioner has the burden of proving that the penalty is inappropriate because of reasonable cause under section 6664. See Rule 142(a); Higbee v. Commissioner, 116 T.C. at 446-448.

"Reasonable cause requires that the taxpayer have exercised ordinary business care and prudence as to the disputed item." Neonatology Assocs., P.A. v. Commissioner, 115 T.C. 43, 98 (2000), aff'd, 299 F.3d 221 (3d Cir. 2002). The good-faith reliance on the advice of an independent, competent professional as to the tax treatment of an item may meet this requirement. Id. (citing United States v. Boyle, 469 U.S. 241 (1985)); sec. 1.6664-4(b), Income Tax Regs. Whether the taxpayer relies on the advice and whether such reliance is reasonable hinge on the

**[\*37]** facts and circumstances of the case and the law that applies to those facts

and circumstances. <u>Neonatology Assocs., P.A. v. Commissioner</u>, 115 T.C. at 98;

sec. 1.6664-4(c)(1), Income Tax Regs. For reliance to be reasonable, "the

taxpayer must prove by a preponderance of the evidence that the taxpayer meets

each requirement of the following three-prong test: (1) the adviser was a

competent professional who had sufficient expertise to justify reliance, (2) the

taxpayer provided necessary and accurate information to the adviser, and (3) the

taxpayer actually relied in good faith on the adviser's judgment." <u>Neonatology

Assocs., P.A. v. Commissioner</u>, 115 T.C. at 99.

Petitioner argues that she reasonably relied in good faith on the advice of

her C.P.A., Mr. Anderson, in preparing her tax returns. Specifically, petitioner

argues that she consulted with Mr. Anderson before starting HQH and that he

independently decided that HQH's activity should be reported as a business on

Schedules F. However, petitioner presented no credible evidence regarding her

discussions with Mr. Anderson or the advice he provided concerning the treatment

of HQH as a business. The record indicates that Mr. Markley, not petitioner,

provided Mr. Anderson with a check register and bills and invoices that enabled

Mr. Anderson to prepare petitioner's tax returns and create financial statements

pertaining to HQH. Neither petitioner nor Mr. Markley reviewed the financial

**[*38]** statements for accuracy or used the statements to improve HQH's performance. On the basis of the record before us, we are unable to conclude that petitioner provided Mr. Anderson with necessary and accurate information regarding the treatment of HQH as a business or that Mr. Anderson provided advice to petitioner that she relied on in good faith. Accordingly, we hold that petitioner is liable for the accuracy-related penalties under section 6662(a) for the taxable years 2006-11 for her underpayments of tax.

Conclusion

Petitioner's ownership and operation of HQH was an activity "not engaged in for profit" within the meaning of section 183 for the years in issue. As a result, the losses from HQH are not deductible under section 162 or 212 for any of the years in issue. We have also held that petitioner is liable for additions to tax under section 6651(a)(1) and for accuracy-related penalties under section 6662(a).

In reaching our decision, we have considered all arguments made by the parties. To the extent not mentioned or addressed, they are irrelevant or without merit.

To reflect the foregoing,

Decisions will be entered under Rule 155.